United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 25, 1997    Decided November 14, 1997

No. 97-1064

NORTHERN STATES POWER COMPANY, ET AL.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF ENERGY AND
UNITED STATES OF AMERICA,
RESPONDENTS

IES UTILITIES, INC., ET AL.,
INTERVENORS

Consolidated with
Nos. 97-1065, 97-1370, 97-1398

On Petitions for Writs of Mandamus Directed to the
United States Department of Energy

*Jay E. Silberg* argued the cause for utility petitioners, with whom *David J. Cynamon* and *Mindy A. Buren,* were on the briefs.

*Don L. Keskey,* Assistant Attorney General, argued the cause for state petitioners, with whom *Frank J. Kelley,* Attorney General, *Thomas L. Casey, Henry J. Boynton* and *Larry G. Watterworth,* Assistant Attorneys General, Michigan, *Robert S. Golden, Jr.,* Assistant Attorney General, Connecticut, *Robert D. VanDiver,* General Counsel, Florida Public Service Commission, *Judith S. Yogman* and *Leslie Greer,* Assistant Attorneys General, Massachusetts, *Rolayne Ailts Wiest,* Assistant Attorney General, South Dakota, *Greg Huwe,* Assistant Attorney General, Minnesota, *Michael A. Gross,* Assistant Attorney General, Florida, *Mary W. Cochran,* General Counsel, Arkansas Public Service Commission, *Bryan G. Moorhouse,* General Counsel, and *Susan S. Miller,* Assistant General Counsel, Maryland Public Service Commission, *Roger W. Steiner,* Assistant General Counsel, Missouri Public Service Commission, *Charles F. Walker* and *Kevin P. Maloney,* Deputy Attorneys General, Delaware, *Carla J. Stovall,* Attorney General, and *John W. Campbell,* Deputy Attorney General, Kansas, *Diane Munns,* Acting General Counsel, Iowa Utilities Board, *Conrad Smith,* Vermont, *Lawrence F. Barth,* Assistant Counsel, *Veronica A. Smith,* Deputy Chief Counsel, and *John F. Povilaitis,* Chief Counsel, Pennsylvania Public Utility Commission, *Steven M. Schur,* Chief Counsel, and *David Ludwig,* Attorney, Public Service Commission of Wisconsin, *Edward W. O'Neill* and *Robert C. Cagen,* Public Utilities Commission of California, *Lawrence G. Malone,* Solicitor, New York State Public Service Commission, *Lester M. Bridgeman,* Alabama Public Service Commission, *James J. Grawe,* Assistant Attorney General, Kentucky, *M. Brent Hare,* Assistant Attorney General, Maryland, *Caroline Vachier* and *Helene S. Wallenstein,* Deputy Attorneys General, New Jersey, *James R. Anderson,* Assistant Consumer Advocate, New Hampshire, *Jeffrey B. Pine,* Attorney General, *Paul J. Roberti* and *Alan M. Schoer,* Special Assistant Attorneys General, Rhode Island, *Shirley E. Guntharp,* Deputy Attorney General, and *Charles L. Moulton,* Assistant

Attorney General, Arkansas, *George M. Fleming,* Mississippi Public Service Commission, *L. Steven Grasz,* Deputy Attorney General, Nebraska, *Frank Spencer,* Special Assistant Attorney General, Mississippi, *Wynn E. Arnold,* Assistant Attorney General, New Hampshire, *Ben Stead,* Iowa, *Carl Josephson,* Assistant Attorney General, Virginia, *F. David Butler,* General Counsel, Public Service Commission of South Carolina, *Thomas D. Warren,* State Solicitor, Maine, *Charles E. Johnson,* Special Assistant Attorney General, North Dakota Public Service Commission, *Daniel B. Dovenbarger,* Deputy Attorney General, Indiana, *Sammy R. Kirby,* Deputy General Counsel, North Carolina Utilities Commission, *Duane W. Luckey* and *Steven T. Nourse,* Assistant Attorneys General, Public Utilities Commission of Ohio, *Joel H. Peck,* Senior Counsel, and *C. Meade Browder, Jr.,* Attorney, Virginia State Corporation Commission, *Gary J. Newell* and *Frances E. Francis,* Public Systems Group, *Michael R. Fontham,* and *Noel J. Darce,* Louisiana Public Service Commission, *Charles D. Gray,* General Counsel, and *James Bradford Ramsay,* Assistant General Counsel, National Association of Regulatory Utility Commissioners, and *Eric A. Eisen,* Arizona Corporation Commission, were on the briefs.

 *John A. Bryson,* Attorney, U.S. Department of Justice, argued the cause and filed the brief for respondents. *Martin W. Matzen,* Attorney, entered an appearance.

 *William H. Chambliss,* Senior Counsel, and *C. Meade Browder, Jr.,* Attorney, were on the brief for intervenor Virginia State Corporation Commission.

 *Michael A. Bauser* was on the brief for intervenor Northeast Utilities Service Company.

 Before: WILLIAMS, GINSBURG and SENTELLE, *Circuit Judges.*

 Opinion for the Court filed by *Circuit Judge* SENTELLE.

 SENTELLE, *Circuit Judge*: In *Indiana Michigan Power Co. v. Department of Energy,* 88 F.3d 1272 (D.C. Cir. 1996), we held that the Nuclear Waste Policy Act ("NWPA") imposes on the Department of Energy ("DOE") an unconditional obligation to begin disposing of high-level radioactive waste

and spent nuclear fuel (collectively, "SNF") by January 31, 1998. After we issued our decision, DOE nonetheless informed various utilities and state commissions ("petitioners") that it would not accept the SNF for disposal by the 1998 deadline. Petitioners now seek a writ of mandamus requiring DOE to comply with *Indiana Michigan* and begin disposing of the SNF by the statutory deadline. We hold that the Standard Contract between DOE and the utilities provides a potentially adequate remedy if DOE fails to fulfill its obligations by the deadline, and thus do not grant in full the writ requested by petitioners. We do agree, however, that DOE's current approach toward contractual remedies is inconsistent with the NWPA and with our prior decision in *Indiana Michigan.* We thus grant the petition in part, and issue a writ of mandamus precluding DOE from advancing any construction of the Standard Contract that would excuse its delinquency on the ground that it has not yet established a permanent repository or an interim storage program.

## I. Background

In the NWPA, Congress, confronting the "national problem" posed by the accumulation of spent nuclear fuel and radioactive waste produced by various domestic sources, 42 U.S.C. § 10131(a)(2), created a scheme whereby the federal government would have the responsibility to provide for the permanent disposal of the SNF, and the costs of such disposal would be borne by the owners and generators of the waste and spent fuel. 42 U.S.C. § 10131(a)(4). The plan provided that the owners and generators of the SNF would have the primary responsibility to provide and pay for its interim storage until the Secretary of Energy accepts the material "in accordance with the provisions of this chapter." 42 U.S.C. § 10131(a)(5).

As part of this regulatory program, Congress authorized the Secretary to enter into contracts with the owners and generators for the acceptance, transportation, and ultimate disposal of the SNF. 42 U.S.C. § 10222(a)(1). Congress left open many of the terms of the contracts, but specifically

dictated, *inter alia,* the deadline by which DOE must begin disposing of the SNF. In the language of the statute, the "[c]ontracts entered into under this section shall provide that ... in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter." 42 U.S.C. § 10222(a)(5)(B). "Payment of fees" referred to hefty contributions into a so-called Nuclear Waste Fund by owners and generators of the SNF.

In accordance with the NWPA, DOE adopted the final Standard Contract after notice and comment. The language of the Standard Contract is slightly different than that of the statute, but does include the requirement that disposal begin by January 31, 1998: "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW [high-level radioactive waste] from the civilian nuclear power reactors ... has been disposed of." 10 C.F.R. § 961.11, Art. II (1996).

In 1993, various utilities and state agencies became concerned about DOE's ability to meet the 1998 deadline, and thus asked the Department to address how it would go about performing its responsibilities. The Department, apparently anticipating that it would not be ready to take the SNF by the deadline, took the position that it did not have a clear legal obligation to accept the SNF absent an operational repository or other facility. In its Final Interpretation of Nuclear Waste Acceptance Issues, issued in 1995, DOE announced that it "does not have an unconditional statutory or contractual obligation to accept high level waste and spent nuclear fuel beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the [NWPA]." 60 Fed. Reg. 21,793-94. The Department also took the position that "it lacks statutory authority under the Act to provide interim storage." 60 Fed. Reg. at 21,794.

The utilities and the states promptly filed petitions for review. The question before us in *Indiana Michigan* was

whether the legal obligation of DOE to accept SNF by January 31, 1998, was conditioned on the presence of an operational repository or interim storage facility. Reviewing DOE's construction of the NWPA under the two-step analysis of *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837 (1984), we concluded that DOE's interpretation was contrary to the unambiguously expressed intent of Congress. We reached this conclusion after analyzing the plain language of the statute, which mandates that DOE assume a contractual obligation to start disposing of the SNF by January 31, 1998. We took special care to emphasize the reciprocal nature of the obligations. DOE's duty to dispose of the SNF in a timely manner is "in return for" the payment of fees into the Nuclear Waste Fund. 42 U.S.C. § 10222(a)(5)(B). We held that DOE's obligation to meet the 1998 deadline is "without qualification or condition," and identified DOE's duty to "perform its part of the contractual bargain." 88 F.3d at 1273. We therefore remanded the matter to DOE for "further proceedings consistent with" our opinion. *Id.* at 1277. DOE neither sought rehearing of that decision nor petitioned the Supreme Court for further review.

After issuing our decision in *Indiana Michigan,* we would have expected that the Department would proceed as if it had just been told that it had an unconditional obligation to take the nuclear materials by the January 31, 1998, deadline. Not so. Quite to the contrary, the Department informed the utilities and the states that it would be unable to comply with the statutory deadline that this court had just reaffirmed. In late 1996, the utilities and the states initiated discussions with DOE and asked about the procedure and schedule that the Department would follow to comply with the court's decision. DOE responded to the utilities by announcing that it "will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." Utility Petitioners' Pet. at Tab 1; *see also* Tab 2. The Department recognized that the delay would affect "large number[s]" of contract holders, but nonetheless expressed "uncertainty as to when DOE will be able to begin spent fuel acceptance." *Id.* The letter ended by cordially inviting "the

views of all contract holders on how the delay can best be accommodated." *Id.*

In a similar letter to the states, DOE wrote that it "understands that states are concerned about the Department's delay," and expressed an interest in talking with the states about how to mitigate the harm caused by the delay. State Petitioners' Pet., Att. D. DOE's letter also revealed one of its asserted reasons for the delay: "The Administration continues to believe that interim storage siting should not proceed until the Department has the benefit of the information resulting from the Yucca Mountain Project Viability Assessment." *Id.* By the Department's own estimates, this Yucca Mountain facility will not be operational until the year 2010. Exhibits to Resp. Response, Tab 6, at 8.

On January 31, 1997, the utilities and state agencies separately petitioned for a writ of mandamus, seeking to compel DOE to comply with *Indiana Michigan* and begin disposal of the nuclear materials by January 31, 1998. Petitioners also requested that their payments to the Nuclear Waste Fund be placed in escrow unless and until DOE meets its obligations to dispose of SNF, and asked that the court prohibit DOE from taking any punitive action toward those who suspend payments to the Fund.

On June 3, 1997, DOE responded to comments submitted by contract holders regarding the anticipated delay. The Department began by recognizing that "Section 302 [of the NWPA] specifies that the contracts shall provide for the Department to begin to dispose of spent fuel not later than January 31, 1998." Exhibits to Resp. Response, Tab 6, at 4. DOE then expressed its belief that "the Standard Contract adopted by the Department pursuant to Section 302 and entered into by the contract holders specifies the available remedies in the event the Department is unable to meet the January 31, 1998 date." *Id.* Under Article IX of the contract, the Department asserted, the Department was "not obligated to provide a financial remedy for the delay," because the delay, in the Department's estimation, was "unavoidable." *Id.* at 2. After conceding that the delay may

result in "hardship" to contract holders, DOE expressed its willingness "to consider amendments to individual contracts that would mitigate the impacts of the delay particular contract holders will experience in the acceptance of their spent fuel." *Id.*

## II. Discussion

Petitioners assert that a writ of mandamus is necessary to force DOE to comply with *Indiana Michigan* and begin acceptance of the SNF by the 1998 deadline. Their argument rests on our prior conclusion that "section 302(a)(5)(B) [of the NWPA] creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998." 88 F.3d at 1277. DOE has not only failed to undertake "further proceedings consistent with" the court's opinion, petitioners argue, but has informed them of its plans to default on its obligations. Petitioners draw special attention to the fact that the Department currently accepts SNF from 41 foreign countries, from which they conclude that DOE is not unable but is simply unwilling to meet the 1998 deadline. They submit that a writ of mandamus is an appropriate remedy for the Department's refusal to comply with *Indiana Michigan* and perform its duties by the deadline set by Congress.[1]

We start our consideration of the petition with the observation that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34 (1980). Mandamus is proper only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *Council of and for the Blind of Delaware County Valley v. Regan,* 709 F.2d

---

[1] The state petitioners also contend that a writ of mandamus is warranted, wholly apart from our decision in *Indiana Michigan,* under *Telecommunications Research & Action Center v. F.C.C.,* 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). State Petitioners' Pet. at 9-12. Because we issue a writ of mandamus to effectuate our decision in *Indiana Michigan,* we decline to reach the additional question of whether issuance of the writ would have been proper under *TRAC*.

1521, 1533 (D.C. Cir. 1983) (en banc). The party seeking mandamus has the burden of showing that "its right to issuance of the writ is clear and indisputable." *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 289 (1988) (internal quotations and citations omitted).

Petitioners have established that they have a clear right to relief, and thus have satisfied the first requirement for a writ of mandamus. As we explained in *Indiana Michigan,* the NWPA requires DOE, "in return for the payment of fees," to begin disposing of the materials "not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B). We specifically noted that the payment of fees into the Nuclear Waste Fund is the "only limitation placed on the Secretary's duties" found in the text of the statute. 88 F.3d at 1276. The owners and generators have dutifully complied with the NWPA, pouring billions of dollars of payments into the Fund with the expectation that DOE would live up to its end of the bargain. The Department, on the other hand, has tersely informed the parties that it "will be unable to begin acceptance of spent nuclear fuel for disposal in a repository or interim storage facility by January 31, 1998." Utility Petitioners' Pet. at Tab 1. Petitioners' full compliance with the requirements of the NWPA, taken in conjunction with DOE's refusal to perform its reciprocal duties, compels the conclusion that petitioners have established a clear right to relief in this case.

The second requirement is also satisfied. DOE's duty to act could hardly be more clear. DOE argued in *Indiana Michigan* that its obligations under the NWPA were contingent on the existence of a repository or interim storage facility. We held that DOE's interpretation was inconsistent with the text of the NWPA, which clearly demonstrates a congressional intent that the Department assume a contractual obligation to perform by the 1998 deadline, "without qualification or condition." 88 F.3d at 1276. DOE's duty to take the materials by the 1998 deadline is also an integral part of the Standard Contract, which provides that the Department "shall begin" disposing of the SNF by January 31, 1998. 10 C.F.R. § 961.11, Art. II. The contractual obligations created consistently with the statutory contemplation leave no room

for DOE to argue that it does not have a clear duty to take the SNF from the owners and generators by the deadline imposed by Congress.

Although petitioners have a clear right to relief, and the Department has a clear duty to act, we decline to issue the broad writ of mandamus sought by petitioners because they are presented with another potentially adequate remedy. Although the statute does not prescribe a particular remedy in the event that the Department fails to perform on time, the Standard Contract does provide a scheme for dealing with delayed performance. 10 C.F.R. § 961.11, Art. IX. Specifically, Article IX of the Standard Contract outlines how the parties are to proceed if one party is unable to fulfill its obligations in a timely manner. Under Article IX, unavoidable delays are to be treated differently than avoidable delays. A failure to perform is considered "unavoidable" only if such failure "arises out of causes beyond the control and without the fault or negligence of the party failing to perform." *Id.* at Art. IX.A. If a party's delay is determined to be unavoidable, that party is not liable for damages caused by the failure to perform in a timely manner. *Id.* An avoidable delay, in contrast, is caused by "circumstances within the reasonable control" of the delinquent party. *Id.* at Art. IX.B. If a party's delay is avoidable, the charges and schedules in the contract must be equitably adjusted to reflect additional costs incurred by the other party. *Id.* The contract also provides a mechanism for resolving disputes of fact that the parties may encounter along the way. *See id.* at Art. XVI.

Petitioners have not convinced us that this contractual scheme is inadequate to deal with DOE's anticipated delay in accepting the SNF. Petitioners have suggested that the contractual processes are inadequate, claiming that they will "suffer additional billions of dollars in additional costs if DOE fails to meet its January 1998 obligation," Utility Petitioners' Pet. at 4, and that they will not be able to recover these costs in the contract proceedings because the Department is excusing its own default. *See* Utility Petitioners' Reply at 2. Such costs may in fact ensue if DOE fails to perform on time, but there is no reason to believe that these additional expenses

will not be taken into account if the contractual processes operate as Congress intended. *See infra* at 11-13. Accordingly, we conclude that petitioners must pursue the remedies provided in the Standard Contract in the event that DOE does not perform its duty to dispose of the SNF by January 31, 1998. This conclusion, we should note, comports with our decision in *Indiana Michigan.* Even though we did not enter a remedy at that time, we suggested that the provisions of the Standard Contract would determine the appropriate remedy for the Department's failure to perform its obligations. 88 F.3d at 1277.

A writ of mandamus is required, however, to compel DOE to comply with our prior mandate in *Indiana Michigan. See Office of Consumers' Counsel v. FERC,* 826 F.2d 1136, 1140 ("A federal appellate court has the authority, through the process of mandamus, to correct any misconception of its mandate by a lower court or administrative agency subject to its authority."); *see also Potomac Electric Power Co. v. Interstate Commerce Comm.,* 702 F.2d 1026, 1032 (D.C. Cir. 1983). We held in *Indiana Michigan* that the NWPA imposes an unconditional obligation, memorialized in the Standard Contract, to begin disposing of the materials by January 31, 1998. We rejected the Department's attempt to water-down its obligations, finding that DOE's interpretation would "destroy[ ] the *quid pro quo* created by Congress" and would mean that the payment of fees into the Nuclear Waste Fund "was for nothing." 88 F.3d at 1276. To effectuate DOE's duty, as we recognized in *Indiana Michigan,* petitioners must be able to enforce the terms of the contract in a meaningful way. Petitioners' ability to enforce the contract would be frustrated if DOE were allowed to operate under a construction of the contract inconsistent with our prior conclusion that the NWPA imposes an obligation on DOE "without qualification or condition." *Id.*

Viewed in this light, DOE's current approach toward contractual remedies violates our directives in *Indiana Michigan.* As explained above, the Department has endeavored to proceed according to Article IX of the Standard Contract, by first informing the parties of its anticipated delay, and then

USCA Case #97-1398    Document #309008    Filed: 11/14/1997    Page 12 of 14

evaluating whether its own delay is "unavoidable." Article IX describes an unavoidable delay as a party's "failure to perform its obligations ... aris[ing] out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11, Art. IX.A. The contract goes on to list a few examples of circumstances "beyond the reasonable control" of the delayed party: "acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather." *Id.* The Contracting Officer isolated six factors that, taken together, supposedly support the conclusion that DOE experienced an unavoidable delay in this case: technical problems; regulatory delays; roadblocks to implementation of interim or monitored retrievable storage; funding restrictions; litigation delays; and consultation requirements. Exhibits to Resp. Response, Tab 6. Reaching the preliminary conclusion that the delay was unavoidable, the Department's Contracting Officer let DOE off the hook for monetary damages.

The most glaring problem with DOE's position is that it is answering the wrong question: it is attempting to explain why it will not have a "state-of-the-art, deep geologic facility for the permanent disposal of the Nation's spent nuclear fuel and high-level waste" ready by 1998. *Id.* Put another way, DOE's position is that its delayed performance is unavoidable because it does not have an operational repository, and does not have the authority to provide storage in the interim. DOE is simply recycling the arguments rejected by this court in *Indiana Michigan*. DOE unsuccessfully argued in that case that it does not have an obligation to take the SNF in the absence of an operational repository or other facility; here, DOE recycles that same argument in the slightly different form that it does not have responsibility for the costs resulting from its failure to perform that duty because it does not have an operational repository or other facility. As we pointed out in *Indiana Michigan,* the NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility. DOE cannot now render its obligation contingent,

and free itself of the costs caused by its delay, by advancing the same failed position that we rejected before.

Given DOE's repeated attempts to excuse its delay on the ground that it lacks an operational repository or interim storage facility, we find it appropriate to issue a writ of mandamus to correct the Department's misapprehension of our prior ruling. Accordingly, we order DOE to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the SNF by January 31, 1998. More specifically, we preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim.

This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity." 10 C.F.R. § 961.11, Art. IX.A. We held in *Indiana Michigan* that the NWPA imposes an unconditional duty on DOE to take the materials by 1998. Congress, in other words, directed DOE to assume an unqualified obligation to take the materials by the statutory deadline. Under the Department's interpretation of the governing contractual provisions, however, the government can always absolve itself from bearing the costs of its delay if the delay is caused by the government's own acts. This cannot be a valid interpretation, as it would allow the Executive Branch to void an unequivocal obligation imposed by Congress. DOE has no authority to adopt a contract that violates the directives of Congress, just as it cannot implement interpretations of the contract that contravene this court's prior ruling. We hold that this provision in the Standard Contract, insofar as it is applied to DOE's failure to perform by 1998, is inconsistent with DOE's statutory obligation to assume an unconditional duty.

III. Conclusion

In conclusion, we do not grant petitioners' broad request for a writ of mandamus because we conclude that the remedi-

al scheme of the Standard Contract offers a potentially adequate remedy.  We do, however, grant the petition in part because DOE has not abided by our prior conclusion that the NWPA imposes an unconditional obligation on the Department to begin disposal of the SNF by January 31, 1998.  We therefore issue a writ of mandamus precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility.  We retain jurisdiction over this case pending compliance with the mandate issued herewith.